# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-05-00206-CR
NO. 03-05-00207-CR
NO. 03-05-00208-CR

**Larry West, Sr., Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
NOS. 9040255, 0940256 & 044052, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

A jury found Larry West guilty of engaging in a motor fuel tax fraud scheme, evading or attempting to evade a motor fuel tax, and failing to remit motor fuel tax. *See* former Tex. Tax Code Ann. §§ 153.118(a), 153.206, 153.221(a), 153.403, 153.404(a).[1] Based on these convictions and previous convictions for motor fuel tax offenses, the jury assessed a twenty-year prison term and a $10,000 fine for each offense. West contends that the tax statute under which he was convicted is unconstitutionally vague, that the district court did not instruct the jury properly on the law of

---

[1] The motor fuel tax statutes have been amended and renumbered since the events on which these convictions are based. *See* Act of May 30, 2003, 78th Leg., R.S., ch. 199, 2003 Tex. Gen. Laws 729, 729 (amended and renumbered statutes codified at Tex. Tax Code Ann. §§ 162.001-.505 (West Supp. 2005)). For convenience, we will refer to the applicable tax statutes as the "former Code."

parties, and that the evidence is legally and factually insufficient to support the convictions. We affirm the judgment.

West was prosecuted for failure to remit taxes relating to the sale or use of motor fuels. West operated a business that delivered "fuel" to certain convenience stores. Tax was due on the "first sale or use" of gasoline or diesel. *See* former Code §§ 153.101, 153.201. Testimony established that, in the normal course of the motor fuel supply business, distributors delivering motor fuel to underground tanks of convenience stores would collect the sale or use taxes upon delivering to the store.

West admits that he did not collect or remit taxes on his deliveries of petroleum products to convenience stores by his company, East Houston Used Oil. He also admits he did not have a distributor's or supplier's permit. However, West denies that he was required to have a permit or to collect and remit taxes because he did not sell the products under taxable circumstances. Other witnesses testified that persons familiar with the industry would know that these products were taxable as sold by West. Thus, the pivotal factual issue is whether West knew he was evading or intended to evade the collection and remittance of valid motor fuel taxes.

West had eighteen years' experience in the fuel-supply industry. He formed East Houston after his release from prison for prior motor fuel tax offenses. The company purchased the remnants of petroleum products pumped from barges after the bulk of the cargo was delivered to its owner. The products included benzene, toluene, xylene, BTX, petroleum blendstocks, and transmix. Some of the products were gasoline additives that would burn in an automobile engine, but might damage an engine if used in too great a concentration.

2

For several weeks in the latter part of 2003, law enforcement officers followed East Houston's tanker truck as it delivered products between Houston and Corpus Christi. The deliveries were often made at night. West or his drivers routinely loaded products from barge strippers into their tanker truck, drove directly to convenience stores, and pumped the products into the underground fuel tanks—sometimes while customers were buying fuel at adjacent pumps. At one store, West put bags on pumps after delivering the product. Harris County Constable Larry Mitchell testified that the bagging was a one-time event caused by the store clerk's assertion that West delivered the product to the wrong tank.

West's suppliers testified that the products purchased by West should not have gone directly to convenience store fuel tanks because of dangers to consumers' vehicle engines and concerns about taxation issues. Russell Allen, the owner of West's supplier K-Solv, testified that he had not heard of his customers putting his product directly into gas station storage tanks and that his product would be taxable upon entry into those tanks. Longtime K-Solv employee Gary Weatherly testified that K-Solv's products might be blended into gasoline and create a product that burned in a car engine, but that the blended product should be tested to determine whether it was safe for the vehicle. Michael Morris, assistant manager of Kirby Inland Marine's Corpus Christi terminal, testified that he would not sell the products in question to someone who he knew planned to sell the product to a convenience store because of taxes and "different legalities on selling gas." Thomas Roy Gates, owner of Bolivar Barge Cleaning Service, Inc., testified that selling his product to a convenience store would be illegal because it was not refined gasoline and taxes had not been paid.

3

Gates also opined that it would not be illegal for West to sell the product to a third party and follow the third party's instruction to deliver the product to a convenience store.

Kirk Davenport of the Comptroller's tax policy division testified the only purpose of convenience store fuel tanks is to store fuel for sale to the public, although Martin Cano, assistant chief of the Comptroller's criminal investigation division, testified that motor fuel theoretically could be removed from the underground tanks without a sale at the pump. Cano testified that the Comptroller believed that putting the product into the gasoline supply tanks constituted blending and, under these circumstances, a "sale" of gasoline.

West testified that he did not represent that the product was gasoline. Undisputed evidence showed that the placards on West's delivery trucks indicated that the trucks contained additives, not motor fuel. West testified that he told convenience store owner Salim Dossani that the product was "petroleum distillates" and not gasoline. West claims that Dossani signed a statement acknowledging that the products were not refined gasoline, but no such certificate is in evidence. West claims that the certificate was among his documents seized by the State, but cannot be located. There was no testimony from any buyers or recipients regarding either what West told them about his products or whether they understood the numeric codes on placards on fuel tankers.

West delivered his product to gasoline storage tanks at convenience stores at the buyers' direction, and said he was selling it, not to the stores, but to a sort of parent company. He testified that he did not know if the recipients were storing the product for later removal, blending it in the tanks with motor fuel, testing it, or doing something else. He believed that the recipient's use of the product was not his business once he delivered it where requested.

4

A driver for West, Willard Lyons, testified that he believed he was delivering "gas" that was "upgrading the super." He said that the liquid he delivered smelled like gasoline. He testified that he overheard West say, however, that he did not want to put the product into his own vehicle. Lyons testified that Kirby supplied the only paperwork involved in any of the transactions in which he participated. Lyons said he believed both that his deliveries were taxable and that West was taking care of those payments. Lyons pleaded guilty to conspiracy to evade motor fuel taxes in a prosecution for his role in these events and was hoping for probation.

Evidence showed that East Houston usually received either cash or money orders for its products. Darrell Brown, a passenger during some of the deliveries, testified that he usually did not see any payment made upon delivery. However, Brown also testified that he once saw driver Nery Chavez counting at least $8,000 in cash on a pinball machine with the store clerk. There was evidence that some of the convenience stores issued money orders payable to a company owned by Dossani to pay for the products. Sharon Maslon, a certified public accountant and senior forensic analyst for the Travis County District Attorney's office, testified that East Houston paid some $804,000—more than $663,000 of which was in cash—to K-Solv alone between June 2001 and December 2002. East Houston also bought products from other companies. By contrast, Maslon found less than $245,000 worth of deposits to East Houston's bank accounts, although she eventually found approximately $809,000 traceable to East Houston's transactions. She testified that she found money orders issued at service stations owned by Dossani. There was also evidence that West or his employees sometimes took the cash they accepted from buyers directly back to their suppliers to pay them.

5

West and his employees did not provide paperwork to the buyers documenting the sales. West contends that he did not complete such paperwork because the nature of the products sold made the transactions not taxable because it was not the "sale" of a motor fuel. Witnesses, including some of West's employees, testified that the failure to provide paperwork was unusual because record-keeping is required to show payment of motor fuel taxes. Maslon testified that this failure to keep records was consistent with avoidance of the creation of a paper trail.

West was charged with various knowing or intentional failures to follow the statutes requiring permits, paperwork, and tax collection and remittance. The jury found him guilty on all counts. In each case, the jury assessed punishment at twenty years in prison and a $10,000 fine.

**Constitutional challenge**

West complains that the statutory scheme was unconstitutionally vague. He argues that the former Code left uncertainty about what was illegal, let the actions of others dictate whether a person has committed a crime, and gave law enforcement and the judiciary too much discretion in determining whether a crime was committed.

We presume that a statute is constitutional. *See State v. Wofford*, 34 S.W.3d 671, 678 (Tex. App.—Austin 2000, no pet.). It is the challenger's burden to show that the statute is unconstitutional. *Id.*; *Ex parte Granviel*, 561 S.W.2d 503, 511 (Tex. Crim. App. 1978). We must uphold the statute if a reasonable construction exists that will render it constitutional and carry out the legislative intent. *Ely v. State*, 582 S.W.2d 416, 419 (Tex. Crim. App. 1979).

A law is void for vagueness if its prohibitions are not clearly defined. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law must give a person of ordinary intelligence a

6

reasonable opportunity to know what is prohibited. *Id*. A law also must provide explicit standards to those who enforce and apply them. *Id*. A vague law "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id*. at 108-09. Where no First Amendment rights are involved, the reviewing court need only determine whether the statute is impermissibly vague as applied to the challenging party's specific conduct. *Bynum v. State*, 767 S.W.2d 769, 773-74 (Tex. Crim. App. 1989). A scienter requirement can overcome problems with vagueness of the statutory language. *See Wisenbaker v. State*, 860 S.W.2d 681, 689 (Tex. App.—Austin 1993, pet. ref'd); *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1981).

The relevant tax code sections criminalized only actions that were intentional or knowing. *See* former Code § 153.404(a). The penal code definitions of knowing and intentional applied to the criminal offenses defined in the tax code. *See* Tex. Pen. Code Ann. §§ 1.03(b), 6.03(a), (b) (West 2003).[2] Offenses incorporating the scienter requirement included those for failure

---

[2] The penal code provides as follows:

    (a)  A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

    (b)  A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Tex. Pen. Code Ann. § 6.03 (West 2003).

7

to create required records, the creation of false records, failure to retain required records, transportation of motor fuel without the required shipping documents, failure to remit collected tax funds, blending products together to evade collecting and remitting taxes, or other attempted evasion of requirements to collect and remit taxes. *See* former Code §§ 153.403(23)-(25), (31), (36), (38), (39). Under those statutes, a person in the supply chain could be held criminally liable only if he knew or intended tax fraud to occur, not merely when another person in the supply chain failed to pay taxes. *Wisenbaker*, 860 S.W.2d at 689.

Tax was due on the first sale or use of gasoline or diesel in Texas. Former Code §§ 153.101, 153.201. Gasoline included "any liquid or combination of liquids blended together offered for sale, sold, or used as the fuel for a gasoline-powered engine. The term includes blending agents, but excludes diesel fuel and liquefied gas." *Id*. § 153.001(10). Diesel fuel was defined as kerosene, another liquid, or a combination of liquids blended together that is suitable for or used for the propulsion of diesel-powered motor vehicles. *Id*. § 153.001(5). Motor fuel included gasoline, diesel, and other substances "offered for sale, sold, or used as propellants of a motor vehicle." *Id*. § 153.001(19). A person liable for payment of motor fuel taxes was required to file reports and remit taxes by the 25th of each month. *Id*. § 153.118(a).

West contends that the statutory scheme was vague in the definitions of the key terms "blending" and "first sale or use" and that the statutes combined to create a vague scheme. Blending was defined as "the mixing together of one or more products with other products to produce a product that is offered for sale, sold, or used as a motor fuel." *Id*. § 153.001(29). The statute defined sale as a "transfer of title, exchange, or barter." *Id*. § 153.001(24). The code provided that

8

"[g]asoline is deemed to be used when it is *delivered into a fuel supply tank*." *Id*. § 153.105(b) (emphasis added). Also, a "user" was defined as "a person who owns or operates a motor vehicle having fuel supply tanks into which gasoline or diesel fuel is delivered." *Id*. § 153.001(27).

West asserts that, under these statutes, the determination of when the tax became due depended on the actions or inactions of the seller and/or the subjective belief of the buyer because a substance was defined as a motor fuel only when offered for sale, sold, or used as a motor fuel. He asserts that the taxability of a transaction should not hinge on the nature of the storage compartment into which a seller placed a product. West contends that the lack of clarity that permitted such assertions shows that the statute was subject to arbitrary and capricious application, rendering it unconstitutionally vague.

West argues that the legislature's revision of the definition of "blending" illustrates the vagueness of the former statute under which he was convicted. The revised definition in the current statute provides in part that blending is "the mixing of one or more petroleum products with another product, regardless of the original character of the product blended, if the product obtained by the blending is capable of use in the generation of power for the propulsion of a motor vehicle." Tex. Tax Code Ann. § 162.001(9) (West Supp. 2005). The revision excludes from the definition a mixing of products that results in a substance that is not capable of use to generate power and eliminates from the definition the requirement that the blended product be offered for sale, sold, or used as a motor fuel. Under both the previous and amended versions, the same theory of taxability exists in this case: West's product, when delivered into the underground tanks, blended with and

9

became gasoline and was offered for sale and sold to consumers for use in their cars. We are not persuaded that these changes demonstrate any vagueness in the former Code that requires reversal.

West also argues that the inclusion in the former Code of the "offered for sale, sold, or used as a motor fuel" language unfairly put his fate in the hands of others, permitting buyers' conduct to convert a legal sale into a crime and granting prosecutors too much discretion. He cites the testimony of Cano, the State's tax code expert, for both propositions. In response to hypotheticals, Cano testified that a person would not commit a crime by purchasing toluene, by selling it if he told the buyer that the product is not gasoline, or by selling it if his buyer then sold it to another person to blend illegally as gasoline. Cano testified, however, that West violated the law by delivering the substances into a gas station's underground tank because the underground tank was attached to pumps dispensing gasoline to consumers. West argues that this shows that his innocent delivery of a liquid into a tank was made criminal by the buyer's sale of the substance to the public and by the prosecutor's decision deeming that delivery of a non-motor fuel to be a blending of gasoline.

The scienter requirement defeats West's complaints that the former Code was unconstitutionally vague. The former Code defined responsibilities for taxes assessed on certain motor fuel transactions, and imposed criminal liability only for intentional or knowing acts or omissions. *See* former Code § 153.404(a). The relevant acts and omissions include failing to collect and remit taxes, evading and attempting to evade the motor fuel tax by engaging in a motor fuel transaction without a required permit, transporting fuel without providing the required shipping document, and failing to retain the documents required of a distributor and supplier. For these

10

offenses, the "first sale or use" phrase defines the taxable event, and the definition of blending provides a way of determining whether a motor fuel is involved. The buyer's conduct did not determine the criminality of the seller's conduct because, to commit a criminal offense, the seller had to knowingly or intentionally shirk statutory responsibilities. *See Wisenbaker*, 860 S.W.2d at 689.

The scienter requirement similarly constrains prosecutorial discretion. Contrary to West's argument, the prosecutor's opinion about the potential uses of an underground storage tank does not make the delivery of a substance into the tank an offense. The prosecutor's belief that substances delivered into an underground tank are blended with and become motor fuel for sale (and thereby taxable) does not alone justify conviction. To obtain a conviction, the State must prove that the person delivering the substances did so knowingly or intentionally, thereby violating his statutory responsibilities regarding record keeping and tax collection with respect to selling a motor fuel. Former Code § 153.404(a). Thus, the prosecution would have to prove that the defendant knew he was violating the statute by selling motor fuel. This requirement to prove scienter negates the possibility that a person could be held criminally liable based simply on the actions of third-party purchasers.

The former Code sections under which West was convicted provided adequate notice of what was required or prohibited, did not permit one person's legal acts or omissions to be converted into criminal behavior by another person's actions, and did not leave too much discretion with the prosecutor. The former Code sections were not unconstitutionally vague.

11

**Sufficiency of the evidence**

West challenges both the legal and factual sufficiency of the evidence to support his conviction on five related offenses.

When determining whether evidence is legally sufficient to support a conviction, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). We do not reassess the weight and credibility of the evidence and thereby substitute our judgment for that of the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).

In a factual sufficiency review, we view all of the evidence in a neutral light, and we will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met. *See Zuniga v. State*, 144 S.W.3d 477, 484-85 (Tex. Crim. App. 2004). We review the fact-finder's weighing of the evidence and may disagree with the fact-finder's determination. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). A factual sufficiency analysis can consider credibility only on those few matters bearing on credibility that can be fully determined from the appellate record. *See Johnson v. State*, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000). A factual sufficiency review must employ appropriate deference to the fact-finder's role as the sole judge of the weight and credibility to be given to witness testimony. *Id*. at 7.

West raises three challenges to the sufficiency of the evidence supporting his convictions. He asserts there was no evidence that the substance he sold was a motor fuel, that he

12

represented that any product he sold was a motor fuel, or that his purchase or resale of his products required any kind of permit or payment of taxes. He also contends that there is no evidence that he received payment for these deliveries. He raises these issues generally against the offenses for which he was convicted.

### 03-05-00206-CR: Failure to remit tax

In this cause, West was charged with failing to collect and remit motor fuel taxes in October, November, and December 2002. The elements of the offense include that West, while acting as a distributor or supplier of motor fuel, intentionally or knowingly failed to remit motor fuel tax funds that he was required to collect and remit. *See* former Code §§ 153.118(a), 153.206, 153.221(a). These statutes were part of parallel statutory frameworks for the collection of taxes due on sales of gasoline and diesel.

West admits that he collected and remitted no taxes on his sales, but denies that he was required to do so because of the nature of the products he sold and the circumstances of his sale of those products. He argues that no evidence shows that he sold the products as motor fuel or represented that he was in the business of selling motor fuel. He testified that he represented his products as "petroleum distillates" rather than motor fuel. He also contends that there is no evidence that he ever accepted payment for the products he delivered.

West testified that he relied on attorney-general letter rulings that he contends show that his activities were nontaxable because he was not selling finished gasoline. None of these letters was written by or to West, and two expressly state that their scope is limited to the facts presented in the letters. One letter concludes that ethanol blended with finished gasoline is taxable, but ethanol

13

blended with natural gasoline (which includes unfinished gasoline and other substances) would not be, because "natural gasoline is not subject to the state motor fuels tax as long as the sales invoice lists the product as natural gasoline." Another letter lists similar conclusions about the taxation and reporting requirements with respect to natural gasoline. A third letter states that transmix is not subject to tax and that a distributor's permit is not required to trade non-finished gasoline substances like transmix and blending materials, but a limited sales and use tax permit is required to issue a resale certificate of blending materials. A fourth letter states that toluene is an unfinished blend stock and is not subject to motor fuels tax "until it is actual[ly] blended with a finished gasoline product." This letter also states that such blending materials are subject only to a limited sales tax when sold as separate products.

These letters do not support acquittal. They show that, in specified circumstances, certain products are not subject to the motor fuel tax. They also indicate that paperwork is often required to substantiate the nontaxable nature of the transaction. None of the letters addresses the taxability of blending agents delivered directly into the underground fuel tanks at a convenience store. The situation most analogous to the facts of this case appears in the fourth letter, which states that toluene is taxable when blended with finished gasoline.

West also testified that he presented certificates to Dossani explaining that West's product was not gasoline. Those certificates are not in evidence, nor was there any evidence of such explanations or certificates given to West's other customers.

A jury could find beyond a reasonable doubt that West's sale of his various products met the definition of a sale of gasoline. Gasoline is a liquid or combination of liquids, including

14

blending agents, offered for sale, sold, or used as the fuel for a gasoline-powered engine. *See* former Code § 153.001(10). West poured his liquids into underground tanks at convenience stores. The only evidence is that West's product would have mixed with the gasoline, thereby becoming gasoline. Although West theorized that his buyers might withdraw the blended product from the underground tank without selling it to the public, there is no evidence that any such withdrawal occurred. Instead, Constable Mitchell testified that he saw customers pumping gasoline as West added his product to the underground tanks. The jury could find from the evidence and reasonable inferences therefrom that West offered for sale or sold his product as fuel for gasoline-powered engines, and knew that it was being sold as such to drivers without further blending or inspection.

West also asserts that no tax was due because he never received payment for any of the deliveries. However, West's employee Brown testified he saw a cash payment. Analyst Maslon testified that she found evidence of $244,302 in deposits to East Houston's bank accounts. She traced money orders issued at service stations owned by Dossani. She also listed two companies that purchased petroleum distillates, transmix, lube oil, or blends as sources of $139,327.87 worth of deposits for East Houston. Inferences from evidence that West's behavior was consistent with avoidance of a paper trail support an inference that he received even more money and tried to obscure that fact. The evidence in the record and inferences therefrom provided legally and factually sufficient evidence that West was paid for the product he delivered.

It is undisputed that West paid no motor fuel taxes on any deliveries during the relevant period. Legally and factually sufficient evidence supports the jury's finding that West

15

intentionally or knowingly sold gasoline during the prescribed months without collecting and remitting required taxes on those sales.

### 03-05-00207-CR: Evasion or attempted evasion of motor fuel taxes

In this cause, the jury was instructed on four different ways it could find that West evaded or attempted to evade motor fuel taxes. The court asked the jury to find whether West intentionally or knowingly engaged in a motor fuel transaction without a permit required for distributors or suppliers, transported motor fuel and failed to deliver a shipping document related to the shipment of motor fuel, failed to retain documents required of those acting as distributors (*id*. § 153.117(a)) and suppliers (*id*. § 153.219(a)), or, while acting as a distributor or supplier, failing to remit motor fuel tax funds that he was required to collect and remit (*id*. §§ 153.118(a), 153.206, 153.221(a)).

The jury findings that West sold gasoline for money figure heavily into the resolution of these assertions. West admits he had no permits, did not prepare or keep any documentation, and paid no taxes. He relied on his asserted belief that he was not selling gasoline and therefore did not need any permits, documents, or taxes. As discussed, legally and factually sufficient evidence support the conclusion that he was selling gasoline. Because he was not selling and delivering it directly into motor vehicles, he was a distributor. *See id*. § 153.001(9). As a distributor, he was required to have a permit, supply and maintain records, and collect and remit motor fuel taxes. *See id*. §§ 153.117(a), 153.118(a). He did none of these.

There was evidence, aside from his years of experience in the industry and generally imputed knowledge of the law, that West was warned of the need to collect and remit taxes if he resold the products. Through Pamela Lyons, accountant for K-Solv, the State introduced certificates

16

signed by West declaring that "the gasoline blendstocks to which this certificate relates will not be used to produce gasoline" and that "if buyer resells the gasoline blendstocks to which this certificate relates, buyer will be liable for tax unless buyer obtains a certificate from the purchaser stating that the gasoline blendstocks will not be used to produce gasoline . . . ." The certificates covered sales to West during 2001 and 2002. No certificates from West's buyers are in the record. He asserts that he obtained such certificates from Dossani and that the State lost or suppressed them after seizing his records. Even if that assertion is true, there are no certificates from any of his other buyers.

Legally and factually sufficient evidence supports the conviction in this cause.

### 03-05-00208-CR: *Motor fuel tax fraud scheme*

In this cause, the jury was instructed to determine whether West had engaged in a motor fuel tax fraud scheme. The jury was asked whether West intentionally or knowingly, and pursuant to one scheme or continuing course of conduct between December 22, 2000, and December 11, 2002, committed one of three offenses on at least three of eighteen different occasions. The alleged offenses included engaging in a motor fuel transaction for which he was required to, but did not, hold a permit as a distributor or supplier, transporting motor fuel to various locations and failing to deliver a shipping document relating to the shipment of motor fuel, or, while acting as a distributor or supplier, failing to retain documents required by former Code sections 153.117(a) and 153.219(a). The jury was instructed to find him guilty if it found at least three instances on which West committed one the alleged offenses.

The evidence discussed above is legally and factually sufficient to support a finding that, on at least three occasions, West sold products as motor fuel as defined by statute and did not hold required permits, maintain or provide documentation, or collect or remit taxes. The evidence

17

was likewise legally and factually sufficient to support a finding that he did this pursuant to a scheme or continuing course of conduct.

**Jury charge**

West contends that the trial court erred by failing to apply the law of parties in the application paragraph of the charge. However, we need not explore the merits of that issue. If the evidence in a record supports an appellant's guilt as a principal actor, any error of the trial court in charging on the law of parties is harmless error. *Cathey v. State*, 992 S.W.2d 460, 466 (Tex. Crim. App. 1999); *Black v. State*, 723 S.W.2d 674, 675 (Tex. Crim. App. 1986). We have concluded that the evidence is legally and factually sufficient to support finding West guilty of each offense as a principal. Accordingly, any error in charging on the law of parties is harmless.

**Conclusion**

We conclude that West has not shown the former Code to be unconstitutionally vague, has not shown harmful error in the charging of the jury on the law of parties, and has not shown the evidence supporting his convictions to be legally or factually insufficient. Accordingly, we affirm the judgments of conviction.

_____

G. Alan Waldrop, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed:  August 25, 2006

Do Not Publish